Nashville Trust Co. *et al. v.* Lebeck *et al.*

(*Nashville*, December Term, 1953.)

Opinion filed July 23, 1954.

166

WHITWORTH STOKES, of Nashville, for Nashville Trust Co., etc.

WALLER, DAVIS & LANSDEN, of Nashville, for Cain-Sloan Co.

JAY G. STEPHENSON, of Nashville, guardian ad litem for Morton Lebeck, Jr., Annie Lebeck, Thomas Gilbert Mendel, Alice Jean Mendel and James Ira Mendel.

CHARLES L. CORNELIUS, SR., of Nashville, guardian ad litem for Morris Lebeck.

HUME, HOWARD, DAVIS & BOULT, of Nashville, REICH, SPITZER & FELDMAN and M. JAMES SPITZER, of New York City, for Harvey Co.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The Nashville Trust Company, Herman Glick and Daniel May, as trustees under the wills of Louis Lebeck, deceased, and Michael S. Lebeck, deceased, filed their original bill in the Chancery Court of Davidson County on August 8, 1951, alleging, among other things, that they held in trust property on the north side of Church Street in the City of Nashville, known as the "Lebeck Building". This building was occupied by the Harvey Company, and for a number of years had been used as one of the large department stores in Nashville. The Harvey lease expired December 31, 1953. Michael S. Lebeck and Louis Lebeck were owners as equal tenants in common.

The bill alleged that complainants had signed a lease with the Cain-Sloan Company for a period of 25 years, the same being made an exhibit to the bill, and that it had been duly recorded in the Register's Office of Davidson County. The base consideration of the lease was $125,000 a year and an agreement to assume other obligations with reference to the property. A copy of the wills of the respective owners is also filed as an exhibit to the bill.

The bill further alleges that, ''The complainant trustees, under the terms of their respective trust instruments, were specifically given the power to lease the above described property, and *were expressly prohibited from selling, mortgaging, creating any lien upon, or otherwise disposing of said property''*. (Emphasis supplied). The italicized language is important, as will later appear in this opinion.

Under the terms of the will of Michael S. Lebeck, his undivided one-half interest was devised to trustees with directions to pay the income to decedent's wife for life and remainder to his sons, Clarence E. Lebeck and Morton S. Lebeck, during their respective lives, etc., with remainder to children or grandchildren, etc. Under the will of Louis Lebeck his undivided one-half interest in the property was devised to Herman Glick, as trustee, with directions to pay the net income to his wife, Leah Lebeck, for life and at her death to certain remaindermen, naming them. It is alleged that Morris Lebeck is 67 years old, unmarried, and is of unsound mind. The will also names certain minor children as beneficiaries, to wit, Thomas Gilbert Mendel, Alice Jean Mendel and James Ira Mendel, who share in the trust property upon the death of their father.

The bill further alleges that complainants are advised that by a proper construction of the respective wills the ''trustees had the power to make a lease beyond the probable duration of the trusts'' including ultimate remaindermen, those in being and those not in being. The concluding paragraph to the bill is important to the issues involved, and is as follows:

''Being advised that they are entitled to the guidance and protection of this court in this matter, the

complainant trustees seek the Court's construction of the respective wills; and, in the alternative, if the Court should be of the opinion that the complainant trustees under the wills did not have the power and authority to make the lease exhibited to the Court, and thereby bind the ultimate remaindermen, that the Court, nevertheless, ratify, confirm, and approve the actions of the trustees in entering into the lease agreement with The Cain-Sloan Company, as a valid and binding exercise of their discretion as trustees, the lease agreement being to the manifest best interests of the trust beneficiaries and the ultimate remaindermen.''

The prayer of the bill is, ''That the respective wills of Michael S. Lebeck, deceased, and Louis Lebeck, deceased, be construed by this Court, with reference to the authority and power of complainant trustees to make leases of the realty in question, and particularly as to the authority and power of the complainant trustees to enter into the aforementioned lease agreement with the defendant, The Cain-Sloan Company''.

There is a prayer in the alternative to the effect that, if the trustees did not have the authority to make the lease in question and bind ultimate remaindermen without the approval of the court, ''that the Court ratify, confirm and approve the action of the complainant trustees in entering into the lease agreement for the term of years mentioned, *as being to the manifest best interests and advantage of the life beneficiaries of the respective testamentary trusts involved,* including the ultimate remaindermen''. The bill is sworn to by Herman Glick and Daniel May.

All parties in interest, including minors and the mental

incompetent, were made defendants. The Chancellor appointed two able members of the Nashville Bar as *guardians ad litem* with full authority to act for the *cestui que trustent,* minors and insane defendants.

Answers were filed by all defendants. The *guardians ad litem* also filed a cross-bill, which was later approved by the Chancellor. The cross-bill brought to the attention of the Chancellor certain information relating to the Harvey Company's rights to remove certain fixtures if its lease was not renewed, etc. The cross-bill made Harvey's a defendant for the purpose of a discovery as to Harvey's offer to lease the building. The Harvey Company answered and exhibited its proposed renewal lease of the property, all of which was objected to by complainants. Complainants moved to dismiss the cross-bill which was denied, and thereafter application was made to Honorable Sam L. Felts of the Court of Appeals for certiorari to review and reverse the action of the Chancellor, but the petition was denied.

We pretermit any reference to the order of reference to the Clerk and Master and his report, since it is not in our view of the case of any importance.

The learned Chancellor held in a memorandum opinion that "the authorities seem to be almost unanimous in this country that such a lease as the one involved here, in order to be binding, must be ratified by the Court." Speaking further, he held: "A number of authorities hold that a lease of trust property terminates with the trust, and any lease beyond its duration is void." *Johnson* v. *Johnson,* 92 Tenn. 559, 23 S. W. 114, 22 L. R. A. 179; *Coffee* v. *Ruffin,* 44 Tenn. 487; *Meath* v. *Porter,* 56 Tenn. 224; 26 R. C. L., Sec. 133 (Trusts); *In re Hubbell Trust,* 14 Am. & Eng. Ann. Cases 648; Bogert on Trusts

and Trustees, Vol. 4, Secs. 790 & 791; and 54 Am. Jur. Sec. 473. Upon the above legal question we are in accord with the Chancellor.

■ It cannot be doubted but that the Cain-Sloan Company lease extends beyond the life of the trust. An examination of the Chancellor's opinion discloses that he held that the trustees were without power to execute a lease that would extend beyond the life of the trust without the court's ratification or express approval. Upon a full consideration of all the evidence the Chancellor disapproved of the Cain-Sloan lease and found that the proposal of the Harvey Company was for the best interest of the beneficiaries.

The complainants appealed to the Court of Appeals and that Court reversed the Chancellor, holding that the trustees had full power to make the lease to Cain-Sloan, which concluded and settled the rights of all parties.

The *guardians ad litem* petitioned this Court for certiorari, which was granted. The issues have been orally argued by counsel and elaborate briefs filed on behalf of all parties in interest.

The principal question at issue is raised in the assignments of error that the Court of Appeals erred in finding and adjudging that the trustees had full power to execute the lease, and that the same was binding upon the mentally incompetent and the minor defendants, and all remaindermen, including those in being and those not in being; it was further error to hold that the trustees had already exercised such power and authority and that the discretion of the Chancery Court could not be substituted for the discretion which the settlors of the trust gave to the trustees.

■ It would unduly prolong this opinion for us to

respond to every contention made by counsel on this appeal, even if thought advisable to do so. At the outset we think the Court of Appeals misjudged the case by holding that the complainants sought a declaratory decree to declare the rights of the parties. Nothing is said in the bill about seeking *declaratory* relief, but the bill was primarily and solely to construe the wills of Michael and Louis Lebeck. While Code Section 8838 authorizes a suit to declare rights arising in the "construction of wills and other instruments", the Court will not entertain it to decide contingent interests that may never arise. *U. S. Fidelity & Guaranty Co.* v. *Askew,* 183 Tenn. 209, 191 S. W. (2d) 533, and cases cited therein.

We also dismiss the contention of counsel for the trustees and Cain-Sloan that the signing of the contract, and recording it, effectively closed the entire matter. If this is to be thought of as true as a matter of law, which we do not concede, then the complainant's suit should have been dismissed.

We look to the wills in a vain search to find appropriate language which confers upon the trustees the power to make the lease in question. The intention of the settlors of the trust to confer such authority must be found within the four corners of the respective wills, expressly or by clear implication, and it is not to be found. The complainants can derive no comfort from the finding of the Court of Appeals that the trustees having the right to sell the property would have the power to lease it. The basic error of this statement is found in the will of Michael Lebeck as follows: "There shall be no power in the trustees to sell, mortgage, create a lien upon, or otherwise dispose of said property, or any part of it." The major premises being false the conclusion is false.

The record before us discloses almost beyond dispute, that the complainant trustees entertained serious doubts as to their authority to make this lease. It appears on the face of the bill and the prayer, *"that they are entitled to the guidance and protection of this court in this matter."* Why should these complainants seek "the guidance and protection of the court" if they had unquestioned authority as they contend? Moreover as further indicating doubts as to the validity of the lease the complainants sought to amend their bill to have the Chancellor approve the Cain-Sloan lease for a period that would not extend beyond the life of the trust. It was properly denied. They are not permitted to assume an unequivocal position as in the original bill, and abandon it for another in an attempt to limit the jurisdiction of the Chancery Court. The complainants' suit presents two amazing and irreconcilable contradictions, to wit, (1) the trustees craved the "protection and guidance" of the court, and at the same time deny the authority of the court to grant any protection to minors and lunatics, the *cestui que trustent;* (2) they have burdened the trust estate with an enormous expense, seeking a decree validating the Cain-Sloan lease and now contend that the lease was and is binding upon all parties *without court approval,* the plain inference being that this suit was not necessary for any purpose. In other words, the court's "advice and protection" is of value to them only if and when it suits their partisan purposes, otherwise its jurisdiction is positively disavowed.

The contention made by the trustees and Cain-Sloan that this was in fact a lease contract which had been definitely concluded, and binding upon all parties in interest, is not sustained by the record. On the contrary

the parties expressly agreed that it would not be a binding obligation until it was approved by the Chancery Court. On April 26, 1951, the parties signed a preliminary agreement which provided:

"A formal lease will be drawn embodying all of the conditions and spelling out the full details of the lease. * * * the lease agreement shall be submitted to and approved by the Chancery Court of Davidson County, Tennessee, and this offer is made subject to such confirmation by the Chancery Court of Davidson County, Tennessee."

On the same day and contemporaneously with the signing of the purported lease agreement, a so-called "Collateral Agreement" was signed by the parties to the effect that the trustees, Morton Lebeck and Ira Mendel will have a bill prepared and filed seeking approval of the lease by a court of competent jurisdiction and determination that the lease is advantageous and should be approved. The foregoing agreements fully justify the conclusion that the lease was merely an offer to lease the property, or a tentative agreement, which was to be binding only when approved by the Chancery Court. The foregoing agreements were later reaffirmed by the trustees as appears in their testimony as follows:

"Q. (To Daniel May). In other words it was your understanding that there was not to be a valid lease *for any period of time,* unless the court approved it? A. That was my understanding.

"Q. That's what you intended when you executed the document? A. I can see no other reason why I went to court."

To the same effect was the testimony of Mr. Warner McNeilly, President of the Nashville Trust Company, as

shown by the following: "I don't know anything about it being left out of the lease, but I know it was contemplated *all the time* that the lease would be submitted to the court, Chancery Court, for approval."

These complainant trustees, having signed the foregoing agreements, and having acknowledged them under oath, are estopped from making the contention that the Cain-Sloan lease was binding upon all parties in interest without the approval of the Chancellor. According to the testimony of May it was not valid *for any period of time*, and with this statement the Court agrees.

The equitable doctrine of estoppel is not a new principle which we think is applicable here. It is as old as the Chancery Court itself, and is universally recognized. One of the elements of estoppel according to Gibson's Suits in Chancery is, "He is not to be heard who alleges what is contrary to his former statement." (Sec. 67, 3rd Ed.). It is further stated by the author, "The estoppel is commensurate with the thing represented, and operates to put the party entitled to its benefit in the same position as if the thing represented were true." The prejudice to the *guardians ad litem* and the insane and minor defendants is the effort to deprive them of the right to the protection of the Chancery Court, i. e. an investigation to determine if the lease contract of Cain-Sloan, or any contract, made on their behalf is for their best interest.

The complainant trustees invoked the jurisdiction of the Chancery Court for its "protection and guidance" and for a decree as to the validity of a particular contract, i. e. the lease proposal of Cain-Sloan. The cross-bill of the *guardians ad litem* prayed that another proposed lease, to wit, the Harvey Company proposal be ap-

praised. When the complainants brought to the Chancery Court the question of their authority under the respective trusts, and craved its jurisdiction for specific purposes, the court, then and there, had jurisdiction for all purposes. The *guardians ad litem* naturally prayed for the protection of minors and lunatics, who had become wards of the court.

The Chancellor in this situation, having considered the issues involved, said:

"The Court being convinced that its action is necessary in the premises, it follows, as of course, that, in acting for those who are unable to act for themselves, the Court will be concerned with the question of obtaining the best contract available for those in whose interests it must act."

■■ We think the Court of Appeals failed to give due consideration to the inherent jurisdiction of the Chancery Court in dealing with the administration of trust estates, especially where the interests of minors and lunatics are involved. With reference to the disposition of the property of infants and lunatics, i. e. the sale or lease of such property, the Chancellor stands *in loco parentis, Ricardi* v. *Gaboury,* 115 Tenn. 484, 89 S. W. 98, 100, and in authorizing "the making of a lease of the property of a minor", must consider that which "will be most beneficial to him." *Ricardi* v. *Gaboury,* supra. Regardless of the pleadings, when minors and lunatics are before the court, the protection of their property rights and interests is said to be "matters of conscience" and fall "strictly within the scope of the Chancellor's extraordinary jurisdiction." Sec. 8, Bispham Principles of Equity. In protecting their rights the Chancellor is not circumscribed and limited by technical pleadings of

counsel, but stands aloof and acts within the law as *parens patriae. Magevney* v. *Karsch,* 167 Tenn. 32, 49-50, 65 S. W. (2d) 562, 92 A. L. R. 343, opinion by Green, C. J.

It is not controverted that where the settlor of a trust directs trustees to dispose of property by sale or lease in a specific manner, and it does not violate any positive rule of law, the trustees must act accordingly to carry out the intention of the testator. But even then the Chancellor has the inherent authority to consider if the trustees have in any way deviated from the mandate of the will to the manifest prejudice of the *cestui que trustent. Ricardi* v. *Gaboury,* supra; Restatement of the Law of Trusts, Sec. 187; Scott on Trusts, Sec. 187. In *Meath* v. *Porter,* 56 Tenn. 224, 228, it is said:

> ''a court of equity will watch over the administration and execution of a trust, and see that the interest of all parties is protected, as far as it can be done consistent with the rules of law and of equity, and fairness to all concerned.''

The foregoing is a clear cut statement of the issue, and it is always the issue except in cases where the will, or instrument creating the trust, expounds itself, and a court review is not at all necessary.

Contention is made by the trustees that the Chancellor has no authority to make a lease contract, but it rests solely within their discretion. That is true only in a qualified sense. In the instant case the Chancellor responded to the issue as to what he conceived to be the manifest interest of the parties and more especially the minors and insane *cestui que trustent.* He clearly indicated in his opinion that ''the trustees will be under a legal and moral duty to execute the lease adjudicated to be best for the estate.''

It conclusively appears that the Chancellor considered the evidence bearing upon every issue and, having done so, disapproved the proposal of Cain-Sloan and approved the Harvey Company's proposal for a renewal contract. He unmistakably pointed out wherein the latter was superior to that of the former. His finding in this regard appears in his action upon the Clerk and Master's report, and covers many pages. It would be well nigh impossible to refer to every fact. But one item in particular should be mentioned. Thus on page 29 of his opinion, he says:

"It is shown by the record that the Harvey Company had spent $686,694.00 on the Lebeck Building during its occupancy thereof up to the time of taking testimony herein, (Harvey exhibits 'AA' and 'BB'), and this is without taking into account what was done by Harveys' own staff of carpenters, painters, and other artisans (Dep. Todd, pp. 109, 112.).

\* \* \* \* \* \*

"Prudent trustees might well have foreseen that, if the present tenant, after having spent so great a sum of money in improving the property, were denied the right of renewal, litigation with respect to these improvements, on surrender of the premises, would almost inevitably follow.

\* \* \* \* \* \*

"It is worth much to an estate to avoid such a controversy.

\* \* \* \* \* \*

"On the question of percentage rental, which is a very vital part of the contract, the record shows that as of the fiscal year ending January 31, 1952, Harveys' sales had attained a level that would result in

the payment of rent considerably in excess of the fixed minimum of $125,000.00 a year; whereas, the Cain-Sloan sales during the same year would not have produced any percentage rental. In fact, on the figures produced, Cain-Sloan sales for that year would fall far short of sufficient volume to produce any percentage rental. Furthermore, it is shown that Cain-Sloan sales would not result in percentage rental until they increased by almost 50% of the total sales over those for the year ending January 31, 1952.''

Another important provision in the Harvey lease, and found to be superior to the Cain-Sloan lease, appears in the Chancellor's findings, as follows:

''Under the Harvey proposal, it is agreed that escalators, air-conditioning, blowers and equipment, elevators, etc., all of which were installed by Harvey prior to the execution of its proposed lease, and any replacement thereof; will be surrendered to the lessors at the end of the term, whereas, there is no requirement in the Cain-Sloan lease for the installation of escalators, air-conditioning equipment, nor is there any requirement that the property be improved.''

The foregoing finding of fact cannot be brushed aside as of no importance. The fixtures and improvements at present represent an investment of $686,694.

No question is made by the trustees as to any lack of financial responsibility of the Harvey Company to fulfill its contract.

It should be noted as we conclude this opinion that the complainant trustees and Cain-Sloan Company did not assign any error in the Court of Appeals to the finding of the Chancellor that the Harvey Company lease was of superior benefit to the trust estate. We think there

is abundant evidence to support his decree. It results that the Court of Appeals is reversed and the decree of the Chancellor is affirmed. The cause is remanded to the Chancery Court for such further orders and decrees as may become necessary to a final adjudication of the rights of the parties.

PREWITT and BURNETT, Justices, concur.

TOMLINSON and SWEPSTON, Justices, dissent.

PREWITT, Justice (concurring).

The Chancellor found for Harvey's and the Court of Appeals reversed, upholding the lease of Cain-Sloan, Incorporated.

The property involved herein is located in the heart of the business district on Church Street in Nashville, and is now occupied by Harvey's, a department store. Immediately to the East of this property is the department store of Cain-Sloan, and the controversy is between the operators of these two department establishments, the property herein involved being known as the Lebeck Building formerly used by Lebeck Brothers as a department store.

Michael S. Lebeck and his brother, Louis Lebeck, were the owners as equal tenants in common of this Lebeck property. Michael S. Lebeck devised his one-half interest in the property to trustees and directed them to lease the property and pay the net income to certain named life beneficiaries; and upon the death of the life beneficiaries, he provided that the trust should cease "and my said undivided one-half interest in said store pass in fee simple to the heirs in law of my said two sons, per stirpes."

Louis Lebeck devised his interest in the Lebeck property to trustees and directed his trustees to lease the prop-

erty and pay the net income to certain named life beneficiaries; and upon the death of the life beneficiaries, he provided that the trust should cease "and my said undivided one-half interest in the store house on Church Street, and my said lot on Broad Street, is to pass in fee simple to the heirs at law of my said three children, per stirpes."

Herman Glick and Nashville Trust Company, trustees under the Michael S. Lebeck will, and Herman Glick and Daniel May, trustees under the Louis Lebeck will, entered into a lease agreement for the Lebeck Building with Cain-Sloan Company, a corporation. This lease is dated May 1, 1951, and runs for a term of twenty-five years beginning January 1, 1954. The Cain-Sloan lease contains the following:

"All parties hereto, who sign this lease agreement in a fiduciary capacity, warrant that they are lawfully authorized and empowered to execute this agreement pursuant to the authority vested in them by operation of law or by the instrument or instruments creating the fiduciary relationship."

However, even though the above provision was in the Cain-Sloan lease, the parties thereto agreed that the trustees would file a bill in the Chancery Court of Davidson County to ascertain by a decree of that court whether the trustees had the power to execute the Cain-Sloan lease so it would be binding upon the ultimate remaindermen of the trust estates for the full lease term of twenty-five years should the trusts, or either of them, terminate before the end of the lease term.

The trustees and the competent life beneficiaries filed a bill against Morris Lebeck, a person of unsound mind and a life beneficiary under the Louis Lebeck will; the

guardian of Morris Lebeck, the ultimate remaindermen of the trust estates, now born, who are minors; and the Cain-Sloan Company, lessee under the Cain-Sloan lease.

The primary purpose of the bill was to secure a decree declaring that the trustees had such authority so that they could bind the ultimate remaindermen of the trust estates, even though the trusts, or either of them, should terminate before the end of the lease term.

The secondary purpose of the bill was that if the court should determine that complainant trustees did not have the authority under the respective wills to execute the lease agreement, then and in that event, the court ratify the lease hereinbefore mentioned as being for the manifest interest and advantage of the life beneficiaries of the respective testamentary trusts involved, including the ultimate remaindermen in being and those not yet in being.

Guardians ad litem were appointed for the incompetent defendants, and their defense was that the trustees did not have the power to execute the Cain-Sloan lease without court approval so as to bind their incompetent clients. The Cain-Sloan Company has the same theory of the suit that complainants have.

The Harvey Company and the incompetent defendants have the same theory of the suit, that is, that the trustees did not have any such power and authority as they undertook to exercise in the execution of the Cain-Sloan lease.

The testimony of Daniel May, one of the trustees, is as follows:

"RX—161 In other words it was your understanding that there was not to be a valid lease for any period of time unless the Court approved the lease?

"A. That was my understanding.

"RX—162 That's what you intended when you executed the document?

"A. I can see no other reason why I went to Court.

"RX—163 That's what you intended?

"A. Yes."

(Also, see May's testimony RX—137, 138, 147, 148)

To the same import is the testimony of Mr. McNeilly, President of the Nashville Trust Company. For instance, on cross-examination, question 158, he stated with reference to submission of the matter to the Chancery Court:

"I don't know anything about it being left out of the lease, but I know it was contemplated all the time that the lease would be submitted to the Court, Chancery Court, for approval."

The trustees and the Cain-Sloan Company entered into a "preliminary agreement" on April 26, 1951, preparatory to the execution of the formal lease heretofore mentioned. It should be borne in mind that this preliminary agreement was entered into by the parties several days before the formal lease was executed.

This preliminary agreement provides:

"The lease agreement shall be submitted to, and approved by, the Chancery Court of Davidson County, Tennessee, and *this offer* is made subject to such confirmation by the Chancery Court of Davidson County, Tennessee."

Simultaneously with the execution of the lease to Cain-Sloan Company on May 1, 1951, a "collateral agreement" was executed by the parties, which provides in part as follows:

"(b) It is understood that there is a legal question as to whether or not the lease will be binding

upon the remaindermen under the will of Louis Le-
beck if Ira Mendel should predecease Morris Lebeck,
and upon the remaindermen under the will of Michael
S. Lebeck if Morton Lebeck should die before the
termination of the lease. Under these circumstances
it is agreed that the trustees, together with Ira Men-
del and Morton Lebeck, will apply to a court of com-
petent jurisdiction for a determination as to whether
or not the trustees have authority to make said lease
for twenty-five years, to be binding upon all parties,
even if the trusts, or one of them, should terminate
prior to the termination of the lease (unless Morris
Lebeck shall have died before such determination,
in which event it will be necessary to apply only as
to the other half interest), and that said application
will be made soon enough to afford ample time for
such determination before the entry of Cain-Sloan
into possession.

"The trustees and Morton Lebeck and Ira Mendel
will have prepared and filed a bill, satisfactory to
them, seeking approval of the lease agreement by
a court of competent jurisdiction, which bill will seek,
among other things, a determination that the trustees
had the authority to execute the lease agreement,
*and that the lease agreement is advantageous* and
should be approved, and a declaration of the rights,
status, and liabilities of the parties."

So then it appears that the trustees and the parties
interested fully understood that the proposed lease, or
the lease to Cain-Sloan, would be subject to Chancery
Court approval.

It should be noted, and this seems to be determinative
of the question, that in the "collateral agreement" just

quoted from that "the trustees and Morton Lebeck and Ira Mendel will have prepared and filed a bill, satisfactory to them, seeking approval of the lease agreement by a court of competent jurisdiction, which bill will seek, among other things, a determination that the trustees had the authority to execute the lease agreement, *and that the lease agreement is advantageous and should be approved* * * * *"

So it is evident that the parties to the "collateral agreement" not only submitted to the court the question of their power and authority to execute the lease agreement with Cain-Sloan, but whether the lease agreement *would be advantageous* and should be approved.

To have the court determine whether the lease agreement was advantageous to the parties (minors and incompetents) is tantamount to determining whether the lease was to the manifest interest and advantage of those under disability, and the parties by their own agreement have made the question of interest and advantage a determinative question to be submitted for decision by the court.

It is a cardinal principle of a construction of wills, deeds, leases and contracts that the entire instrument will be looked to and examined to determine the intention of the parties. *McCord* v. *Ransom,* 185 Tenn. 677, 207 S. W. (2d) 581, and cases therein cited.

There appears no doubt that the question of whether the lease executed to Cain-Sloan was for the advantage of those under disability was one of the primary objects of the bill, and the parties cannot be heard to say now that the primary question was one of power of authority and thus limit the inquiry.

"While the law of judicial estoppel is ordinarily

applied to one who has made oath to a state of facts in a former judicial proceeding which in a later proceeding he undertakes to contradict, yet it is frequently applied, where no oath is involved, to one who undertakes to maintain inconsistent positions in a judicial proceeding.'' *Stamper* v. *Venable*, 117 Tenn. 557, 97 S. W. 812; *Stearns Coal & Lumber Co.* v. *Jamestown R. Co.*, 141 Tenn. 203, 206, 208 S. W. 334.

It requires no citation of authority to show that the Chancery Court has plenary and broad jurisdiction to watch over and care for the interests of minors and incompetents. When the Chancery Court has jurisdiction for one purpose it will take jurisdiction for all purposes. After the Chancery Court obtains jurisdiction of a suit for the purpose of granting some distinctive equitable relief, if the circumstances of the case permit, and all the parties in interest are brought before it, it will determine the entire controversy and award full and final relief so as to do complete justice to all the litigants and so as to bring all possible litigation over the subject matter within the compass of one judicial determination. Gibson's Suits in Chancery, 4th Ed., Secs. 36, 38.

Once the jurisdiction of the Chancery Court has been invoked to obtain a judicial construction of a trust instrument and directions as to the trustee's conduct, because of doubt as to the true meaning and intent of provisions of the instrument creating the trust, or as to the particular course which the trustees should pursue, the trustees must faithfully obey any directions which the court gives. Only in this way would he be relieved of personal liability, and a refusal or neglect to obey may

render the trustee liable to summary punishment. Pomeroy's Equity Jurisprudence, Vol. 4, p. 179, Sec. 1064.

Under the trust agreement and the facts of the case, it appears that the trusts would terminate before the expiration of the lease, and any lease beyond its duration is void. Bogert on Trusts and Trustees, Vol. 4, Sec. 790-791, 54 Amer. Jur., Sec. 473.

In Bogert on Trusts and Trustees, Vol. 4, Sec. 790, it was said:

"Nevertheless, the trustee may be in doubt as to the precise extent of his authority or as to the soundness of his judgment to grant a lease that may extend many years beyond the termination of the trust. To protect the trust and for his own protection, it is the duty of the trustee to consult the Court before making such a lease."

This course should have been followed in the instant case, especially where the trustees themselves testified that they understood that any lease would have to be approved by the Chancery Court.

Once this case was in the Chancery Court, and that Court took jurisdiction, minors and incompetents being involved, the Chancellor considered the case with an eye to the best interests of those under disabilities, and it seems by a comparison of the offers of the two opposing parties that the Chancellor was correct in coming to the conclusion that the offer of Harvey's was for the manifest interest and advantage of those under disabilities, and we think he was correct in his decree in ordering the trustees to accept the proposition of Harvey's rather than the Cain-Sloan Company.

It results that the decree of the Court of Appeals should be reversed and that of the Chancellor affirmed.

TOMLINSON, Justice (dissenting).

Mr. Justice Swepston and I think that we should record the reasons which impel us to dissent from the scholarly opinion written for the majority of our brothers on the Court by our Chief Justice. A preliminary statement of the existing situation should, however, be made.

The owners of the Lebeck Building vested their testamentary trustees with the authority and duty of deciding the terms under which, and persons to whom, these testamentary trustees would lease that building. Pursuant to such authority and duty, they agreed with the Cain-Sloan Company upon its lease involved in this litigation. Notwithstanding this, the majority opinion directs, in effect, the issuance of a mandamus upon these trustees to scuttle the Cain-Sloan lease, and lease the building to the Harvey Company for twenty-five years in accordance with terms and conditions which were proposed by Harvey after the Cain-Sloan lease had been consummated.

The reason for the above stated action upon the part of the majority of this Court is that the three constituting that majority think, as did the Chancellor, that the lease proposed by Harvey is "superior to" the Cain-Sloan lease. Disavowing any intention to debate this collateral matter, we do observe that (1) the weight of the evidence, according to the report of the Clerk & Master, favors the Cain-Sloan lease and (2) every sui juris life tenant and remaindermen financially interested in the Lebeck Building and its rental income, including parents of interested minors, have testified that each prefers the Cain-Sloan lease.

We think that the Court (1) has no authority, in con-

nection with the leasing of the Lebeck Building, to substitute its discretion for that which the owners of that building preferred to vest in these trustees, and (2) is without authority to compel these trustees to exercise their discretionary power in a way selected and commanded by it, the Court. In addition, it is the opinion of at least the writer of this dissenting opinion that the majority opinion—though I am sure it does not so intend—imposes a material inequity, to speak conservatively, upon the Cain-Sloan Company in the action which it has taken. And, by the same token, has awarded Harvey that to which Harvey is not equitably entitled. This last stated assertion will be discussed first.

The Harvey Company, as assignee of a twenty odd years lease, has been occupying the Lebeck Building for some years. Anticipating the expiration on December 31, 1953, the trustees, in keeping with a sound business practice, early in 1950 initiated negotiations with Harvey for a lease commencing January 1, 1954. These negotiations continued for much more than a year. However, the only offer they could ever get from Harvey was one which they considered niggardly and financially disadvantageous in a substantial manner to the beneficiaries of the Lebeck trusts.

In this plight of the matter the trustees then initiated negotiations with the Cain-Sloan Company. That Company, after a reasonable length of time, made the proposal which finally resulted in the lease agreement which this Court today, by its majority opinion, orders the trustees to repudiate. However, before the trustees accepted the Cain-Sloan offer they again approached Harvey and inquired as to whether it had made its best offer. Its reply was that it had. Thereafter, and subsequent to

the consummation of the lease agreement between the trustees and Cain-Sloan, Harvey made the proposal which the Court by today's majority decision, orders the trustees to accept.

I am of the opinion that, under the circumstances just stated, it is (1) not right, as a matter of equity, or business ethics, to deprive the Cain-Sloan Company of this lease and (2) the Harvey Company is not equitably entitled to it. In my opinion, a Court ought no more to tolerate a wrong that supposedly benefits a trust, than it should tolerate a wrong that is detrimental to that trust.

In considering the action of the Court in substituting its discretion for that of the trustees, it should be kept in mind that this action is taken only because it is thought by the majority that the Harvey lease is "the superior" of the two. There is no finding, as indeed, there could not be, that these trustees have acted in bad faith, or arbitrarily abused the discretion vested in them. Therefore, this action of the Court in substituting its discretion for that of the trustees seems to be contrary to the rule which this Court has always heretofore followed. That rule is clearly stated by our Court of Appeals in the case of *Smith* v. *Fleisch*, 4 Tenn. Appeals, 139, 147, in language approved by this Court as follows: "Unless bad faith or a gross and arbitrary abuse of discretion on the part of the trustees is shown, a court of chancery will never interfere with the performance of the duties of the trustee in carrying out the terms of the trust, * * * ." The language used by Scott on Trusts, Section 187, is that "the court will not substitute its judgment for his, (meaning the trustee) * * * so long as he acts not only in good faith and from proper motives, but also within the bounds of a reasonable judgment."

Moreover, in ordering these trustees to enter into the lease agreement proposed by Harvey, the majority has, in our opinion, ignored the long recognized rule stated as far back as 1850 by our case of *Deadrick* v. *Armour,* 29 Tenn. 588, 596, to be that "where trustees have a discretionary power to consent or not, a court of equity has no power to control or enforce them." All it can do if they violate the trust is to remove them, after holding their action illegal.

The departure from these rules, as well as the action taken by the majority, is rested upon a premise which, in our opinion, (1) does not in fact exist and (2) assuming its existence, does not render legally permissible the action taken.

The premise upon which the majority predicates its action is that the Cain-Sloan lease was by agreement of the parties not to become effective unless sanctioned as to all its terms and conditions by the Court. This being the *supposed* situation, the Court is authorized, so says the majority, to order the trustees to accept a lease with a different party because the Court thinks it the superior of the two leases.

The majority decision establishes this premise by means of the construction which it places upon the word "approved", as used by the trustees and Cain-Sloan during the course of their negotiations. The tentative offer recited that "it would probably be necessary to have Court approval of the lease". The trustees' letter of acceptance stated that it should "be approved by the Chancery Court". Another stated that it was "subject to appropriate court approval". Testimony was to the same effect. In giving so broad a construction to the word "approved", as there used, the majority opinion

has, we think, failed to consider the facts and circumstances surrounding the use of that word, in these negotiations. Those circumstances will now be stated.

It is not reasonably possible to lease the Lebeck Building on advantageous terms, or to a responsible lessee, unless the lease be for a reasonably long term. All the proof in this case is that the lease of a building in Nashville of the type and location of the Lebeck Building reasonably requires a duration of between twenty and thirty years. Pursuant to this requirement, the trustees and Cain-Sloan Company agreed that the duration of this lease would be twenty-five years.

Because of the fact, however, that the Lebeck wills provided that each trust "shall cease" upon the death of certain life tenants, and fee simple title vest in remaindermen, and because the ages of some of these life tenants were such that in all probability they would die long before twenty-five years had passed, the parties were doubtful as to whether the contemplated twenty-five years provision in the lease would be of any further validity after the death of a life tenant occurring before the expiration of that twenty-five years. The sole surviving life tenant of one of the two trusts was seventy and one half years old at the effective date (January 1, 1954) of the lease.

Except as to this period of twenty-five years, there was never any doubt in the minds of any one, and could not reasonably have been, that the trustees had authority, in the absence of an abuse of discretion, to agree, without court approval, upon such terms, conditions and provisions as they saw fit in the making of the lease. Hence in the use of the word "approved" by the Court, the parties had in mind, we think, an approval as to the term

of twenty-five years, if the court should first find that the wills did not give the trustees the authority to make a lease extending in time beyond the probable duration of both or either of the trusts.

The collateral agreement between the parties conclusively demonstrates, we think, that the construction we have just placed upon the word "approved", as used by these parties, is the correct construction. That collateral agreement, after reciting that "there is a legal question" as to the authority of the trustees to validly lease the building for twenty-five years, then provides that the trustees "will apply to a court of competent jurisdiction *for a determination as to whether or not the trustees had authority to make said lease for twenty-five years* to be binding upon all parties, even if the trusts, or one of them, should terminate prior to the termination of the lease". (Emphasis supplied.)

The trustees are expressly given the right to make such an application to the Court by Code Section 8838(c) providing that any "trustee * * * may have a declaration of rights or legal relations * * * to determine any question arising in the administration of the * * * trust, including questions of construction of wills". Scott on Trusts—and I know of a no more highly respected text authority on the subject—says at Section 189.3, page 1015, that when the authority as to the period of time for which trustees may agree that a lease will run does not seem to them to be clearly expressed in the trust instrument, then "the trustee *should seek* the advice of the superior Court as to the period they may be made to run". (Emphasis supplied.) Pursuant to that right and duty the trustees filed this bill.

We think the prayers of that bill conclusively place

upon the word "approved", as used by these parties, the construction which we have placed upon it. Moreover, since parties to a litigation are bound by their pleadings, it becomes immaterial as to what these parties meant by their use of the word "approved" in negotiating the Cain-Sloan lease. The bill says this lease is binding upon the trustees if they had the authority to make a lease of twenty-five years, or if the Court approves such a period of time. The answer of Cain-Sloan says identically the same thing. So, it makes no difference what meaning the parties had in mind during the course of negotiations in their use of the word "approved".

In quoting the pertinent prayers of this bill any italicizing is added. Prayer 2 of the bill is as follows:

"2. That the respective wills of Michael S. Lebeck, deceased, and Louis Lebeck, deceased, be construed by this Court, with reference to the authority and power of complainant trustees to make leases of the realty in question, and particularly as to the authority and power of the complainant trustees to enter into the aforementioned lease agreement with the defendant. The Cain-Sloan Company, *so as to bind the life beneficiaries and the ultimate remaindermen, both those in being and those yet unborn, for the term of years commencing January 1, 1954, and ending December 31, 1978.*"

The other (third) prayer of the bill is as follows:

"3. That, *in the alternative, if* the Court should be of the opinion that the complainant trustees *did not have the authority* under the respective wills *to execute* the lease agreement *for the period of years* set out in the lease agreement so as to bind the ultimate remaindermen, those in being and those not yet

in being, without obtaining approval of this Court, *that the Court ratify, confirm and approve the action of the complainant trustees in entering into the lease agreement for the term of years mentioned,* as being to the manifest best interests and advantage of the life beneficiaries of the respective testamentary trusts involved, including the ultimate remainder-men in being and those not yet in being.''

In our opinion, the language of these prayers permits only the conclusion that the relief prayed by the bill of the trustees is that the Court construe these wills with reference to the power of the trustees to make a lease for a period of time longer than the probable duration of the trusts, and if the wills do not give that power, then that the Court approve the action of the trustees in agreeing to a lease of twenty-five years as being manifestly to the best interest of all concerned.

Therefore, we think that the premise upon which the majority rests its conclusion does not in fact exist. Moreover, had it existed, that would not, in our opinion, make legally permissible the action of the majority. In the New York case of *City Bank Farmers Trust Co.* v. *Smith,* 263 N.Y. 292, 189 N. E. 222, 223, 93 A. L. R. 598, 600, it is said that :

''In accepting a trust, the trustee assumes the duty of administering the trust with reasonable care. That duty cannot be shifted, and though, at times, a trustee, when in doubt, may ask instructions of the court, the court will not, ordinarily, advise the trustee what course he shall pursue where there is room for the exercise of choice.''

There is room for the exercise of choice in the making of a lease of the Lebeck Building, as demonstrated by the

fact that two leases are before the Court in this case. The only thing as to which there is doubt is the period of time which the trustees are authorized to let the lease run. That, then, is the only question which these trustees have the right to ask the Court to determine; and it is the only question that the Court has the authority to determine, in our opinion, in this case where the terms and provisions which should be inserted in the lease of the Lebeck Building are matters which its owners left to the discretion of these trustees.

In my judgment, when these wills are properly construed, it must be held that each of the Lebeck brothers intended to vest his trustees with the authority to make a lease for a reasonable period of time (in this case 25 years) regardless of whether such period of time would extend beyond the probable duration of both or either of the trusts.

Each of these wills, within its four corners, demonstrates that the dominant scheme and purpose of each testator was to provide his widow and children an income during all the years of their lives from rents paid by the lessees of the Lebeck Building. They had no way of knowing the identity of those who would then become the owners of this building. It has to follow by necessary implication that each testator intended for his trustee to agree upon such a term of years in the making of the lease as would procure an advantageous lease to an acceptable lessee. To say that the testator intended to limit the power of the trustees as to the period of time to the probable duration of the trusts is to say that the testator intended to so shackle his trustees as to destroy the rentability of the property. No responsible person would lease it under such conditions.

The Wisconsin Case of *In re Upham*, 152 Wis. 275, 140 N. W. 5, 48 L. R. A., N. S., 1004, is so similar in its facts pertinent to the instant case on the point under discussion as to make its reference appropriate. After observing that the property involved was of such character and location as to require a lease of long duration, if its income producing character was not to be seriously impaired, the Court said this:

"So from the will itself and from it, in connection with the circumstances characterizing its origin, we are constrained to hold that the power to lease, within any reasonable limitations, * * * was given by Mr. Plankinton to his trustees, * * * unless such unqualified power as was conferred in this case 'during the term of the trust' by necessary implication or by settled law, conferred no power to create a leasehold term extending beyond the termination of the trust.

"The general doctrine, applicable to the matter under discussion, is that an express power to lease given to a trustee, confers authority to make a lease for any reasonable period, considering the kind of property and the custom of the country and all the circumstances bearing on the subject.

* * * * * *

"* * * where effectuation of the purpose of the trust reasonably requires the long lease. Then the power to do so, unless expressly or by necessary implication negatived, is presumed to be conferred by the trust. The exercise of it to carry out the purposes of the trust, is as legitimate as the exercise of any power expressly conferred." 152 Wis. 275, 140 N. W. 5, at pages 11-12, 48 L. R. A., N. S., at pages 1014-1016.

The power to make this lease of twenty-five years is not negatived by either of the Lebeck wills expressly or by necessary implication. The only fact which raised a question in the minds of the trustees was that each will provides that the trust for the benefit of the life tenants shall cease upon the death of the life tenants and fee simple title vest in the remaindermen.

The fact is that upon the termination of the trust by reason of the death of a life tenant, the rents from that time on to the expiration of the lease are the properties of, and will be paid directly to, these who then, as remaindermen, become the owners of the property. Except, therefore, in a strictly technical sense, that period of the lease then unexpired is not in conflict with that provision of the will directing the vesting of title in fee simple upon the death of the life tenant.

In our case of *Ricardi* v. *Gaboury,* 115 Tenn. 484, 493, 89 S. W. 98, 100, (a case in which the powers of testamentary trustees were not involved) the Court said with reference to the making of a ninety-nine year lease in which minors were interested that:

" * * * the making of a lease such as the one desired by the complainants in this cause does not deprive the parties of any interest in the property to be leased. Its effect is simply to prevent the lessors from entering upon the property and taking actual possession thereof as long as the terms of the lease are observed by the lessee. The title to the property, and the right of alienation subject to the lease, remain as if no lease had been executed."

But if there be a conflict, this provision with reference to the termination of the trust must yield to each tes-

tator's dominant scheme and intent to procure to his widow and children an income during their lives from the proceeds of the lease of the Lebeck Building. *East & Collins* v. *Burns*, 104 Tenn. 169, 181, 56 S. W. 830. When this required yielding to that dominant intent is had, it seems to follow that implicit in this dominant intent of each testator is the intent to authorize his trustees to rent the Lebeck Building under any condition for a reasonable length of time (in this case twenty-five years) without regard to the probable duration of either trust estate.

But if mistaken in the conclusion that the intent of the testators was to vest authority in the trustees to lease the property for a reasonable term of years, notwithstanding the fact that such a term will extend beyond the probable duration of the trust, nevertheless, all the Courts which have been involved in this litigation have concurred in finding that it is for the best interest of all concerned that the Lebeck Building be leased for a reasonable period of time, to wit, twenty-five years; and that, in the language of Scott on Trusts, the Court is authorized to permit, and does permit, a lease of this duration "since the Court has power to authorize or direct deviations from the terms of the trust where exigencies have arisen not contemplated by the settlor". Scott on Trusts, Section 189.3, pages 1015-1016. In our opinion the Court should have stopped right there. This would have left in full force and effect the lease which the trustees, in the exercise of the discretion that the testators clearly vested in them, had selected, to wit, the Cain-Sloan lease.

However, we think the Court has strayed far from the law of trust, as heretofore understood and practiced,

in going further by substituting its discretion for that of the trustees, in a matter as to which there is a choice, and in mandamusing, in effect, these trustees to scuttle the lease which they had made and sign the one which the majority of this Court considers "superior".